IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

THOMAS D. STEELE                      )
                                      )      Case No: 4:08-CV-85
v.                                    )      MATTICE/CARTER
                                      )
MICHAEL J. ASTRUE,                    )
        Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the plaintiff a period of

disability, disability insurance benefits, and supplemental security income under Title II and Title

XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382.  This matter was referred to

the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil

Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion

for Judgment Based upon the Administrative Record (Doc. 18) and defendant's Motion for

Summary Judgment (Doc. 22).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be

AFFIRMED.

## Plaintiff's Age, Education, and Past Work Experience

Plaintiff was 40 years old on August 1, 2003, when he alleges he became disabled (Tr. 49,

51). He is classified as a younger individual.  He completed the sixth grade and entered the 7th

grade.  He was unable to obtain his GED (Tr. 141, 142).   He has past relevant work experience

as a chicken hanger, a short order cook, a glove turner, and a housekeeper (Tr. 26, 114).

1

## Applications for Benefits

Plaintiff applied for Disability Insurance Benefits (DIB) on April 29, 2004, and alleged a disability onset date of August 1, 2003 (Tr. 100-02). Plaintiff protectively filed an application for Supplemental Security Income (SSI) on March 9, 2004 (Tr. 18).[1] The Agency denied his application(s) initially (Tr. 49-50), and on reconsideration (Tr. 51-58). Plaintiff requested a hearing (Tr. 45), and on January 22, 2007, Administrative Law Judge (ALJ) Robert Erwin held a video hearing at which Plaintiff and a vocational expert, Anne Thomas, testified (Tr. 933-63). On March 21, 2007, ALJ Erwin found Plaintiff not disabled because he could perform a significant number of light jobs (Tr. 18-28). Plaintiff requested Appeals Council review (Tr. 13-14), but on August 20, 2008, the Appeals Council declined review, and the ALJ's decision became the Commissioner's final decision in this case (Tr. 6-9). 20 C.F.R. § 404.1481. Plaintiff now seeks judicial review.

## Standard of Review - Findings of the ALJ

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A). The burden of proof in a claim for Social Security benefits is upon the claimant to show disability. *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national

---

[1] None of the documents pertaining to Plaintiff's SSI application are in the record.

2

economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted). The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After consideration of the entire record, the ALJ made the following findings:

1. The claimant meets the insured states requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since August 1, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc disease; history of coronary artery disease and status post coronary artery stenting surgery; chronic obstructive pulmonary disease (COPD); diabetes mellitus; generalized anxiety disorder; depressive disorder no otherwise specified (NOS); borderline intellectual functioning (20 CFR 404.1520(c)) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work activity of a light exertional level as defined by applicable regulations. However, he should perform no more than occasional climbing, stooping, bending, or crouching; standing, walking, or sitting for more than 30 minutes continuously; and is precluded from concentrated exposure to dust, fumes, smoke, chemicals, noxious gases, or temperature extremes. He can understand and remember detailed tasks with some, but not substantial difficulty, but cannot do so with complex tasks. He can concentrate and attend to the same tasks, despite some difficulty. He can interact with coworkers and supervisors without significant limitations. He can relate with the general public despite some difficulty, and this difficulty does not substantially impact his ability to relate with the general public. He can adapt to work-like settings and changes with some, but not substantial, difficulty.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on xxxxxxxx, x, 1962 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a marginal education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability as defined in the Social Security Act, from August 1, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-28).

## Issues Presented

Plaintiff raises the following issues:

1) Whether the ALJ erred in finding that the plaintiff had the residual functional capacity to perform a reduced range of unskilled light work.
2) Whether the ALJ erred in failing to find the plaintiff met the requirements for Listing 1.04.
3) Whether the ALJ erred in failing to consider the combined effect of plaintiff's multiple impairments, including pain.
4) Whether the ALJ erred in rejecting the opinion of the plaintiff's treating physicians.

For reasons that follow, I conclude substantial evidence does support the ALJ's findings.

## Relevant Facts

### A. Testimony of Plaintiff

At the January 22, 2007, hearing, Plaintiff testified that he lived with two of his children, ages 17 and 14, and his partner (Tr. 939). Plaintiff acknowledged his daughter had a child, a four-month old baby, who also lived with them (Tr. 948). Plaintiff said he had a valid driver's license with no restrictions and testified that he drove 3-4 days each week (Tr. 941). He would drive for various purposes, including going to the store, picking up one of his children, or going to pay his bills (Tr. 941). He only went to school through the sixth or seventh grade and was

5

fourteen years old when he left school (Tr. 941). Plaintiff testified he had worked for three or four years as a housekeeper when he injured himself at work (Tr. 943). Plaintiff said he was pushing a meal cart upstairs and when he came out of an elevator, he slipped and fell between the elevator doors, injuring his back and his wrist (Tr. 943). At the hearing, Plaintiff could not recall whether he injured his right or left wrist (Tr. 943). As to his back, Plaintiff testified surgery was planned, but then cancelled when Worker's Compensation would not pay for it (Tr. 943-44). Plaintiff underwent at least one session of physical therapy, but he testified it did not help him (Tr. 944).

Plaintiff testified doctors discovered he had diabetes in 2003, and he treated it with insulin and a pill (Tr. 944). Plaintiff testified he did not have good control of his blood sugar (Tr. 945). Although he alleged breathing problems, and testified he quit smoking more than a year prior to the hearing, Plaintiff testified recent stressful events had caused him to "smoke a couple" (Tr. 945). Plaintiff also related he had a number of skin cancers removed from his arm, back, and legs (Tr. 945).

Plaintiff testified to a four-year history of depression and anxiety (Tr. 946). He had to give up many of his past activities but also stated he took his children swimming once the previous summer and went fishing once or twice last year (Tr. 947). With regard to household activities, Plaintiff testified his partner, Richard, did the shopping, although Plaintiff went with him (Tr. 947). Richard, according to Plaintiff, was on disability after undergoing a quadruple bypass (Tr. 947). Plaintiff said his two children did many of the household chores (Tr. 947). However, because his daughter attended school, Plaintiff and Richard looked after her baby (Tr.

6

949).  He testified he had trouble holding the baby, who weighed less than fifteen pounds (Tr. 950).

Plaintiff testified his pain was unbearable without his medications (Tr. 951).  He did not identify any adverse side effects from his medications (Tr. 951).  He stated he used a cane whenever he went to the store or anytime he tried to walk (Tr. 952).  Plaintiff testified about two stent placements for his coronary artery disease and alleged his arms tended to go numb and he experienced chest pain that required emergency room visits (Tr. 952).  He testified he had vision problems, but doctors had told him he had to get his blood sugar under control before he could obtain glasses (Tr. 954).  At the time of his hearing, Plaintiff's psychiatrist had moved (Tr. 954).  He was receiving mental health treatment from his family physician (Tr. 954).

**B.     Medical Evidence**

On August 1, 2003, Plaintiff suffered a fall at work.  X-rays of his left wrist revealed a normal left wrist (Tr. 301).  X-rays of his coccyx revealed a normal coccyx (Tr. 301).

On October 22, 2003, George H. Lien, M.D., noted Plaintiff had fallen on August 1, 2003, and landed on his back (Tr. 213).  He had a magnetic resonance imaging (MRI) scan on September 9, 2003, that showed a relatively minor disc protrusion at L5-S1 (Tr. 213).  Despite some narrowing of the left neuroforamen, there was no gross disc herniation (Tr. 213).  Dr. Lien recommended physical therapy (Tr. 213).

On March 18, 2004, Plaintiff saw Brett Babat, M.D., at Midstate Neurosurgery who opined Plaintiff was not a good candidate for a spine fusion surgery for several reasons (Tr. 264).  Dr. Babat noted Plaintiff was a very heavy smoker and he had produced 3 out of 5 positive Waddell's signs, perhaps 4 out of 5 if one considers overreaction (Tr. 264).  Dr. Babat opined

these findings put Plaintiff at further risk of not doing well from a fusion (Tr. 264). Dr. Babat

noted that, at present, Plaintiff needed to be restricted to sedentary work and he expressed his

hope that after physical therapy, Plaintiff could get back to more demanding physical work (Tr.

264). However, Dr. Babat noted that Plaintiff would probably never be capable of performing

heavy physical labor (Tr. 264).

On May 12, 2004, Dr. Lien saw Plaintiff and reported he continued to have lower back

pain with left greater than right-leg radiating pain (Tr. 259). Dr. Lien noted Plaintiff had not

been working and that physical therapy did not produce any relief (Tr. 259). On examination, Dr.

Lien found Plaintiff to be in moderate-severe distress (Tr. 259). Dr. Lien noted Plaintiff had

been previously known to have degenerative changes with annular fissure with concordant pain

by diskogram (Tr. 259). Thus, Dr. Lien opined that an overall good option for Plaintiff would be

a lumbar interbody fusion with pedicle screw implementation (Tr. 259). Plaintiff agreed and

wanted to undergo the procedure, and Dr. Lien indicated they would seek approval from

Plaintiff's worker's compensation carrier for the procedure (Tr. 259).

On the same date, May 12, 2004, Dr. Lien released Plaintiff to return to modified duty

work as of May 13, 2004, with no lifting of more than five pounds (Tr. 260). Dr. Lien limited

sitting and/or standing to thirty minutes at one time and he specified that these thirty minute

periods needed to be followed by five minutes of standing (following the thirty minutes of

sitting) or five sitting (following thirty minutes of standing) (Tr. 260).

On June 15, 2004, Dr. Caten filled out a "Range of Motion" form at the request of the

Disability Determination Service (Tr. 334-35). All ranges were normal in Plaintiff's cervical

spine (Tr. 334). Flexion was 70 degrees in his dorsolumbar spine (90 is normal), extension was

normal, but right and left lateral flexion were both reduced from 25 to 15 degrees in Plaintiff's

dorsolumbar spine (Tr. 334). All ranges in Plaintiff's shoulders and elbows were normal (Tr.

334). Similarly, all ranges of motion were normal in Plaintiff's hips, knees, ankles, and wrists, as

well as his hand-fingers (Tr. 335). Dr. Caten indicated that Plaintiff would experience pain with

sitting for 15-20 minutes (Tr. 336). After that he would need to get up and walk, but Plaintiff

would also experience pain on standing for 15-20 minutes (Tr. 336). Dr. Caten indicated that

Plaintiff could not do any lifting (Tr. 336). In terms of reasoning and thinking capabilities, Dr.

Caten opined that Plaintiff's understanding was "OK", that there was "some loss" of

concentration, and that social was "OK" (Tr. 336).

On July 1, 2004, Mark S. Goldfarb, M.D., described Plaintiff as a person who has had

hypertension for about eight or nine years, diabetes for about four months, and elevated lipid

levels for at least four months (Tr. 355). Dr. Goldfarb noted Plaintiff had smoked two-to-three

and even up to four packs of cigarettes a day for many years (Tr. 355). Dr. Goldfarb noted

Plaintiff was being seen for an intervention, probably a drug-coated stent in his anterior

descending artery (Tr. 355). On July 1, 2004, Plaintiff underwent successful stenting of a mid-

anterior descending stenosis (Tr. 353).

On July 12, 2004, Plaintiff saw Mary Kay Matthews, a Licensed Psychological Examiner

(L.P.E.), and Harry Steuber, Ph.D., a licensed psychologist, for a clinical interview and IQ

assessment (Tr. 342-49). He told Ms. Matthews that he tried to work on June 13, 2004, and

found after ninety minutes that he could not stand the pain (Tr. 343). Ms. Matthews thought

Plaintiff showed signs of an obsessive-compulsive disorder (Tr. 344). For example, he stated

that there was only one right way to do things, and that if someone else did something, he would

9

redo it (Tr. 344). Plaintiff commented that things were never clean enough (Tr. 344). Plaintiff noted he had not been cooking much lately, but he stated he usually cooked on the grill about three times each week (Tr. 345). Ms. Matthews opined Plaintiff would not be limited in his ability to appropriately relate to others, either in public or private (Tr. 345). Ms. Matthews opined Plaintiff could manage his own benefit funds (Tr. 345). She also opined he would not be limited in his ability to understand, remember, and carry out simple instructions, but Plaintiff would be moderately limited in his ability to remember and carry out more detailed instructions (Tr. 347).

On July 21, 2004, Plaintiff entered the hospital with complaints of left arm numbness and chest pain (Tr. 404). Dr. Gibson saw Plaintiff and advised him to undergo a stress test (Tr. 404). The stress nuclear study produced negative results and Plaintiff remained chest-pain free through discharge on July 22, 2004 (Tr. 404).

On January 13, 2005, Plaintiff saw Kendra Bellamy, the nurse practitioner for Robert S. Davis, M.D. (Tr. 380-81). Ms. Bellamy described Plaintiff as a person in no acute distress (Tr. 381).

On January 25, 2005, an MRI revealed a narrowed disc space at L5-S1 with a bulging disc, as well as mild spinal stenosis (Tr. 379). There was no focal protrusion or impingement of the spinal canal (Tr. 379). The impression was of little change when this study was compared to the MRI done on September 9, 2003, other than, perhaps, some mild interval involution of the bulging disc (Tr. 379).

On January 31, 2005, Dr. Gibson saw Plaintiff for routine follow-up status post LAD stenting in July (Tr. 397). Dr. Gibson noted Plaintiff's smoking was down to a pack and a half of cigarettes per day (Tr. 398)

On February 2, 2005, Dr. Caten referred Plaintiff for a stress test for follow-up after the LAD stenting (Tr. 395). This testing produced no compelling scintigraphic evidence of active myocardial ischemia or left ventricular dysfunction (Tr. 395).

On March 4, 2005, Frank Pennington, M.D., reviewed the record and opined Plaintiff could perform light work (lifting up to 20 pounds occasionally, and up to ten pounds more frequently) (Tr. 382A). He could stand and/or walk as well as sit for about six hours in an eight-hour day (Tr. 382A).

On September 30, 2005, Plaintiff saw Dr. Gibson for routine follow-up after cardiac intervention (Tr. 730). He presented no new complaints (Tr. 730).

On November 1, 2005, Plaintiff entered the hospital complaining of chest pain and shortness of breath (Tr. 691). On examination, Plaintiff appeared as a well-nourished, well-developed person, in no acute distress, who was alert and oriented (Tr. 692). Since Plaintiff appeared to be in pulmonary edema, Dr. Meriwether ordered a chest x-ray (Tr. 603).

On November 2, 2005, an x-ray of Plaintiff's chest showed that his lungs were clear and normally expanded. His cardiomediastinal silhouette was normal, and the bones and soft tissues were normal (Tr. 688).

On December 6, 2006, Plaintiff entered the hospital due to substernal chest discomfort (Tr. 775). Arthur E. Constantine, M.D., the admitting physician, noted that prior to this admission, Plaintiff had been doing well, although he started back smoking recently (Tr. 775).

11

On examination, Plaintiff appeared well, with no increased breathing throughout the exam (Tr. 776). Dr. Constantine also reported Plaintiff demonstrated good ranges of motion (Tr. 776). During the hospitalization, Plaintiff underwent an echocardiogram that revealed a sinus (normal) rhythm with tiny diagnostic Q waves in leads III and AVF; otherwise, Dr. Constantine termed the echocardiogram results normal with no acute changes (Tr. 777).

On January 11, 2007, Louis E. Koella, M.D., filled out a form entitled "Medical Assessment of Ability To Do Work-Related Activities (Physical)" (Tr. 769-72). Dr. Koella limited Plaintiff to lifting five pounds, noting he could do so infrequently and that Plaintiff had difficulty transferring a gallon of milk across the kitchen (Tr. 768). Dr. Koella limited Plaintiff's standing and walking to less than thirty minutes at one time (Tr. 770). Plaintiff could sit for less than one hour due to his fractured coccyx (Tr. 770). Dr. Koella also referred to Plaintiff's lumbar disc disease with degeneration according to an MRI (Tr. 770). Dr. Koella acknowledged the assessed limitations were based partially on Plaintiff's subjective complaints but also based on objective findings (Tr. 772).

### C. Testimony of the Vocational Expert

VE Anne B. Thomas testified that Mr. Thomas had performed one semi-skilled job (Tr. 957). Otherwise, all of his past work ranged from light-to-medium and was unskilled (Tr. 957-58). The ALJ posed a hypothetical question that limited the worker to a range of light work that required no more than occasional climbing, stooping, bending, or crouching (Tr. 958). This person could not stand for more than thirty minutes continuously and he would need to change positions for his comfort throughout the day (Tr. 958). He could not work in environments where he would have concentrated exposure to dust, fumes, smoke, chemicals, or noxious gases

(Tr. 958).  Similarly, this person could not have constant exposure to temperature extremes (Tr. 958).  This person could only understand and remember detailed tasks with some difficulty and he would not be capable of performing complex tasks (Tr. 958).  He would have some difficulty concentrating and attending to tasks and he would have significant limitations in interacting with supervisors and co-workers, though he could relate to the general public, despite some difficulty (Tr. 958).  He could adapt to work-like settings and to changes with some, but not substantial, difficulty (Tr. 958).  The ALJ then asked the vocational expert to take Plaintiff's age, education, and past history into account and asked if a person with this background and these limitations could perform any of Plaintiff's past jobs (Tr. 959).  VE Thomas responded that the need for a sit/stand option would eliminate all of Plaintiff's past jobs (Tr. 959).  However, such a person could perform other light-level jobs, including 1,800 statewide jobs as a product inspector, 7,000 statewide jobs as a production laborer, and 3,000 statewide jobs as a production machine operator (Tr. 959).

If the ALJ reduced the hypothetical person's exertional level to sedentary work, this person could perform 1,100 statewide jobs as a small products assembler (Tr. 959), 500 statewide jobs as a small products inspector, and 800 statewide jobs as a production laborer (Tr. 900).  A person who would be absent from work three or four days each month would not be capable of working (Tr. 900).

**Analysis**

1) <u>Did the ALJ err in finding that the plaintiff had the residual functional capacity to perform a reduced range of unskilled light work?</u>

13

Plaintiff first argues the ALJ committed reversible error in finding that the plaintiff had the residual capacity to perform a reduced range of unskilled light work. Plaintiff reviews the limitations placed on Plaintiff by the ALJ and argues a review of the entire record reveals Plaintiff is not capable of performing light work, a reduced range of unskilled light work as the ALJ found, sedentary work or any work on a sustained basis.

In response, the Commissioner notes the ALJ determined Plaintiff's residual functional capacity (RFC - what one can do in spite of his impairments, 20 C.F.R. § 404.1545), and determined that he retained the RFC to perform light work with no more than occasional climbing, stooping, bending, or crouching. The ALJ limited standing/walking and sitting to no more than thirty minutes at one time. He also precluded Plaintiff from jobs that would expose him to concentrated levels of dust, fumes, smoke, chemicals, noxious gases or temperature extremes (Tr. 21). Because Plaintiff also had severe mental impairments, the ALJ precluded him from performing complex tasks, although the ALJ found he could understand and remember detailed tasks with some but not substantial difficulty (Tr. 21). Plaintiff could interact with co-workers and supervisors without significant limitations, and, despite some difficulty, he could relate to the general public (Tr. 21).

The ALJ also found Plaintiff could adapt to work-like setting and changes with some but not substantial difficulty (Tr. 21). The ALJ found, after considering the evidence of record including Plaintiff's testimony, that while his medically determinable impairments could reasonably be expected to produce some of Plaintiff's alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible (Tr. 23). At step four, the ALJ found that Plaintiff could not perform any of his past

14

relevant jobs (Tr. 26). At step five, the ALJ considered Plaintiff's vocational factors in conjunction with the medical-vocational guidelines ("the Grid") and the testimony of the vocational expert and determined that Plaintiff was not disabled because he could perform a significant number of light and/or sedentary jobs (Tr. 26-28).

The Commissioner then points to the medical record to show a basis for the ALJ's assessment. As early as May 12, 2004, Dr. Lien felt that Plaintiff had recovered sufficiently to return to modified duty work (Tr. 260). Dr. Lien limited lifting to five pounds and sitting and standing to no more than thirty minutes continuously (Tr. 260). Although the ALJ felt that by March 2007, Plaintiff's lifting capabilities had increased, the ALJ did limit standing, walking, and sitting to no more than thirty minutes continuously (Tr. 21).

Plaintiff emphasizes the need for fusion surgery and the decision of his worker's compensation carrier that rejected Dr. Lien's recommendation for the surgery. Dr. Babat opined that fusion surgery would not benefit Plaintiff and agreed that as of April-May 2004, Plaintiff was ready to return to sedentary work. In his April 28, 2004 report, Dr. Babat opined that "for now," Plaintiff needed to perform sedentary work only. Dr. Babat expressed his hope that, eventually and after physical therapy, Plaintiff may be able to perform more demanding work, but Dr. Babat noted that Plaintiff would probably never be able to return to heavy physical labor (Tr. 264). Thus, despite their differences about the possible benefits of Plaintiff undergoing fusion surgery, two physicians of record, Dr. Babat on April 28, 2004, and Dr. Lien on May 12, 2004, both felt that Plaintiff was ready to return to modified duty work (Tr. 260, 264).

In addition to these opinions, the ALJ relied on the assessments of the state agency reviewing doctors, Drs. Pennington and Miller, both of who opined that Plaintiff could perform light work (Tr. 382A, 417). Plaintiff argues "neither of these state agency physicians took into consideration any of the other very serious medical conditions suffered by the plaintiff." (Doc. 19, Plaintiff's Memorandum, p. 8). The Commissioner argues and the record reflects Dr. Pennington's review considered Plaintiff's fall at work in August 2003, the MRI from September 9, 2003, which Plaintiff has highlighted in his brief, Plaintiff's use of a cane as of March 2004, the recommendation for surgery as of May 12, 2004, and the successful cardiac or angiographic stenting performed in July 2004, as well as the report of no chest pain as of January 2005 (Tr. 386). Dr. Pennington did considered Plaintiff's medical conditions. Dr. Miller, in addition to considering all of the above (Tr. 421), also considered Plaintiff's complaints of left wrist pain and his vision problems (Tr. 420).

Plaintiff has also cited to an assessment done by his current treating physician, Dr. Koella, in January 2007 (Doc 19, Plaintiff's Memorandum p. 9, citing Tr. 769-72). The ALJ considered this opinion and assigned it little weight (Tr. 24). The ALJ gave good reasons for assigning little weight to Dr. Koella's opinion, noting, for example, that even Plaintiff described greater abilities than are set out in Dr. Koella's assessment (Tr. 24). However, Dr. Koella's opinion includes a statement that Plaintiff's sitting is limited to less than one hour due to a coccyx fracture (Tr. 770). There is no record of a fractured coccyx. An x-ray of Plaintiff's coccyx taken on August 1, 2003, showed a normal coccyx (Tr. 301). On October 22, 2003, Dr. Lien stated that he did not see any evidence of fractures within Plaintiff's coccyx (Tr. 213). I conclude the ALJ was not required to rely on an assessment that limited Plaintiff as the result of

16

an injury, a supposed fractured coccyx, that he never had. Moreover, Dr. Koella's treatment notes indicated good progress on Plaintiff's part (Tr. 752-58). This good progress, according to Dr. Koella's treatment notes, contradicts his very severe restrictions on the RFC form.

Plaintiff argues his condition has not improved despite all the conservative modalities, including physical therapy (Doc. 19, Plaintiff's Memorandum P. 10). The Commissioner notes it is unclear how much physical therapy he had. Dr. Babat talked about a course of physical therapy with a grossly inadequate trial of exercise in his report from April 2004 (Tr. 263). Plaintiff testified about having physical therapy a year prior to his hearing, but that session does not appear to be in the record. Taking the evidence as a whole I conclude the ALJ's finding, that Plaintiff could perform a limited range of light or sedentary work, is consistent with the evidence of record and is supported by substantial evidence.

2)      Did the ALJ err in failing to find the plaintiff met the requirements for Listing 1.04.

Next Plaintiff argues the ALJ erred in failing to find Plaintiff met the requirements for Listing 1.04.

Listing 1.04 provides: *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

>  A. Evidence of nerve root compression characterized by neuron-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

The Commissioner argues Plaintiff's back condition does not meet or equal the requirements of Listing 1.04 (Disorders of the Spine) because Plaintiff has shown only that his conditions might satisfy one or two of the requirements of the listing and has not demonstrated that his back condition meets all the requirements, which is necessary to meet Listing 1.04. *See Sullivan v. Zebley*, 493 U.S. 521, 525 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severe, does not qualify."). For example, Listing 1.04 requires evidence of nerve root compression. Plaintiff's MRI from January 25, 2005, showed no focal protrusion or impingement of the spinal canal (Tr. 379). Thus, there was no nerve root compression and no way that Plaintiff's condition could be seen as meeting the requirement of Listing 1.04.

Plaintiff accuses the ALJ of completely ignoring the results of a previous MRI, performed on September 9, 2003, and Plaintiff observes that this MRI showed degenerative disc disease with herniation at L5-S1 (Plaintiff's Brief at 5, citing Tr. 220). Plaintiff points to a CT scan of his lower lumbar spine post diskogram and notes that this study showed a central and left paracentral tear with small HNP (herniated nuclear pulposis) compressing the S1 nerve root (Tr. 271). Dr. Lien does not refer to this finding in his report. He noted that at L3-4 and L4-5 the diskogram was normal without any pain (Tr. 268). The Commissioner also argues the results from the diskogram provided one of many reasons why Dr. Babat disagreed with Dr. Lien and felt that Plaintiff would not be a good candidate for fusion surgery (Tr. 265).

18

Plaintiff refers to a May 12, 2004 note from Dr. Lien (Plaintiff's Memorandum at 5-6, citing Tr. 259). The treatment note in question demonstrates that Plaintiff's condition lacked another essential element of Listing 1.04, sensory loss. Dr. Lien, in his May 12, 2004 report noted that motor strength was normal in all muscle groups of Plaintiff's lower extremities and that sensations were intact to pinprick (Tr. 259). Because the record appears to support only some and not all of the requirements of the listing and because there is no treating or examining physician who suggests a listing level impairment, I conclude Plaintiff's back condition does not meet or equal the requirements of Listing 1.04 and that there is substantial evidence in the record to support this conclusion.

3)     Did the ALJ err in failing to consider the combined effect of plaintiff's multiple impairments including pain?

Plaintiff next argues the ALJ committed reversible error in failing to consider the combined effect of plaintiff's multiple impairments, including pain. The combined effect of multiple impairments is to be considered in making a determination of disability. *See Barney v. Secretary of Health & Human Services,* 743 F.2d 448, 453 (6th Cir. 1984); *Trout v. Heckler,* 735 F. 2d 965 (6th Cir. 1984).

Plaintiff notes the ALJ found at page 20 of the Decision that Plaintiff suffers from the following impairments:

1. Lumbar degenerative disc disease
2. History of coronary artery disease and status post coronary artery stenting     surgery
3. Chronic obstructive pulmonary disease (COPD)
4. Diabetes mellitus
5. Generalized anxiety disorder
6. Depressive disorder not otherwise specified (NOS)

19

7. Borderline intellectual functioning

8.

In response, the Commissioner points to the thorough review of the evidence by the ALJ. For example, he points to Dr. Caten's consultative examination. The Range of Motion form, as filled out by Dr. Caten, found full ranges of motion in every area tested except for certain measurements in Plaintiff's dorsolumbar spine (Tr. 334-35). As such, the very brief comments that Dr. Caten included at Tr. 336-37 were unsupported by any medical evidence, including the ROM form that Dr. Caten submitted. He points to Dr. Babat's opinion that Plaintiff could return to modified work as of late April 2004, and Dr. Babat's statement that with physical therapy, Plaintiff's capabilities should increase (Tr. 263-65).

Plaintiff argues the ALJ failed to note a finding of decreased pinprick during an examination with a nurse practitioner, Ms. Bellamy, who apparently worked for Robert S. Davis, M.D. (Doc. 19, Plaintiff's Memorandum at 13). However, the Commissioner argues the great majority of Ms. Bellamy's examination supports the ALJ's findings. Ms. Bellamy reported that Plaintiff was well-developed, well-nourished and in no acute distress (Tr. 361). She also reported a normal gait with tandem walking and negative straight leg raising testing (Tr. 361). These findings seem to refute allegations of back pain as well as Plaintiff's alleged need for a cane (Tr. 361).

Plaintiff makes the point that his cardiac condition has required stenting (Doc. 19, Plaintiff's Memorandum at 14). However, after successful stenting done in July 2004 (Tr. 386), he had a follow-up with Dr. Gibson on February 2, 2005, which consisted of Adenosine Stress Cordiality Imaging (Tr. 395). This procedure, done seven months after the stenting, produced no

compelling scintigraphic evidence of active myocardial ischemia or left ventricular dysfunction (Tr. 395). After that, Plaintiff entered the hospital with chest pain in December 2006, but an echocardiogram done during that hospitalization produced basically normal results (Tr. 777).

Plaintiff argues the ALJ mentioned his Type I diabetes only in passing. Plaintiff's Brief at 14. However, the ALJ observed that Plaintiff's poor control of his blood sugar is likely related to his lack of compliance with prescribed treatment (Tr. 24). For example, on December 5, 2005, Dr. Koella reported that DM was modestly controlled and that he would add a medication, Avandemet, to Plaintiff's current regimen (Tr. 758). However, when Plaintiff returned for his next visit on January 16, 2006, Plaintiff related that he was not taking Avandemet as directed (Tr. 757). During his next visit on February 15, 2006, Plaintiff told Dr. Koella that he was not taking his blood pressure medication, Metoprolol, as directed (Tr. 757).

Plaintiff points to Plaintiff's poor vision (Plaintiff's Brief at 15). However, Dr. Busbee indicated that this "problem" could be corrected with better blood sugar control and a new pair of glasses (Tr. 412).

Plaintiff makes the point that his mental health treatment stopped after his provider moved (Doc. 19, Plaintiff's Memorandum at 15). Dr. Koella reported this move in a note dated April 17, 2006 (Tr. 756). Plaintiff then asked Dr. Koella to increase the Xanax prescription to a higher dose (Tr. 756). Dr. Koella's next two notes (May 17 and June 19, 2006) did not say anything about anxiety (Tr. 755). On September 14, 2006, however, Dr. Koella reported that except for not controlling blood pressure well, Plaintiff was doing well (Tr. 753). Similarly, Plaintiff was doing well on October 11, 2006, despite a good deal of stress (Tr. 752). Thus, it

appears that Dr. Koella's decision to increase Xanax allowed Plaintiff to do well with his anxiety even in the face of stress and despite losing his primary mental health care provider.

Plaintiff points to the findings from the consultative examination done by Ms. Matthews in July 2004 (Doc. 19, Plaintiff's Memorandum at 15-16). However, the ALJ adopted most of Ms. Matthews' findings and included those findings, particularly the findings related to interactions with co-workers and the public, in his RFC finding (Tr. 21, 345, 347).

Plaintiff refers to his testimony that even with his medications, his pain still registers at a high level (Doc 19, Plaintiff's Memorandum at 17). Plaintiff saw Dr. Koella approximately twelve times between November 7, 2005 (Tr. 758) and October 11, 2006 (Tr. 752). He complained of a bad lower back on his initial visit (Tr. 758). On February 15, 2006, he told Dr. Koella that his back still bothered him at times (Tr. 757). His back was still tender on his next visit (Tr. 757), but during his next visit, on April 17, 2006, Plaintiff complained of hip pain that radiated down to his thighs (Tr. 756). Back and neck pain were unimproved as of May 17, 2006 (Tr. 755). On July 17, 2006, Plaintiff's complaints centered around sinus allergies and head congestion, after he went swimming (Tr. 754). At the next visit, on August 16, 2006, Plaintiff reported that his back pain was stable on Percocet and Soma (Tr. 754). On September 14, 2006, Plaintiff saw Dr. Koella for follow-up on his high blood pressure but was otherwise doing well (Tr. 753). And, as noted on October 11, 2006, Plaintiff had no new complaints, except a lot of stress and "has been doing well" (Tr. 752). As the Commissioner argues, Dr. Koella's notes do not appear to describe a person in significant pain.

22

Plaintiff further argues the ALJ overstated the extent of his activities (Doc 19, Plaintiff's Memorandum at 18). However the record supports that he went swimming in July 2006 (Tr. 754), and he and his partner provided care for his daughter's baby (Tr. 949). Plaintiff quotes a passage of his testimony in which he stated that he was finding it difficult to lift the baby who weighed less than fifteen pounds (Doc. 19, Plaintiff's Memorandum at 18, citing Tr. 920, 921, 926). However, as the Commissioner argues, even if the baby weighed less than ten pounds, the ALJ has accounted for such a limitation. As the Commissioner argues, even if Plaintiff is limited to sedentary work, he is "not disabled" due to his younger age and the testimony of the vocational expert, who identified both light and sedentary jobs that a hypothetical person with Plaintiff's characteristics could perform (Tr. 959-60). The record reflects the Plaintiff has limitations, but not to such a degree that all work is precluded.

I conclude the ALJ looked at all of the evidence, and determined that Plaintiff could perform a limited range of light or sedentary work. That finding is consistent with the evidence. These findings appear to the undersigned to show the ALJ did in fact look at the combination of Plaintiff's multiple impairments in reaching his final conclusion.

4)    Did the ALJ erred in rejecting the opinion of the plaintiff's treating physicians?

Next Plaintiff argues the ALJ ignored the opinions of treating physicians, Drs. Lien, Caten, and Koella.

The treating physician rule which gives greater and sometimes controlling weight to the treating physician is based on the assumption that a medical professional who has dealt with a claimant over a long period of time has a deeper insight into the claimant's condition than one

23

who has examined a claimant but once or simply reviewed the medical evidence. *See Barker v. Shalala*, 40 F.3d 789 (6th Cir. 1994). However, the ALJ is not required to accept any medical opinion, even that of a treating physician, if that opinion is not supported by sufficient clinical findings. *See* 20 C.F.R. § 404.1527(d)(3); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) ("This court has consistently stated that the [Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

Here the ALJ compared and contrasted the opinions of record and accepted the opinions he concluded were best supported by the record evidence. In this case there was conflicting evidence.

Plaintiff argues the ALJ of completely ignored a consultative examination done by Dr. Caten in June 2004 (Doc 19, Plaintiff's Memorandum, p. 8). I conclude any error in failing to review this form is harmless. Dr. Caten's consultative examination consisted of a two-page range of motion (ROM) form (Tr. 334-35), and two (difficult to read) handwritten pages (Tr. 336-37). The ROM form showed that Plaintiff retained full ranges of motion in his cervical spine, shoulder, and elbow (Tr. 334), and that he also had full ranges of motion in his hip, knee, ankle, wrist, and hand-fingers (Tr. 335). Only one area, Plaintiff's dorsolumbar spine, showed any limitation of motion, and even there, one of the four measurements, extension, was normal (Tr. 334). With a nearly normal range of motion in every area tested except one, Dr. Caten's suggestion that Plaintiff could not perform any lifting, not only contradicted the rather cautious and temporary limitations of Drs. Lien and Babat and such a severe restriction appears to

contradict Dr. Caten's basically normal range of motion findings. There are three additional

pages of notes which appear to relate to treatment from April to June of 2004 (Tr. 337-339).

Dr. Koella limited Plaintiff to lifting five pounds, noting that he could do so infrequently

and that Plaintiff had difficulty transferring a gallon of milk across the kitchen (Tr. 768). Dr.

Koella limited Plaintiff's standing and walking to less than thirty minutes at one time (Tr. 770).

Plaintiff could sit for less than one hour due to his fractured coccyx (Tr. 770). Dr. Koella also

referred to Plaintiff's lumbar disc disease with degeneration according to an MRI (Tr. 770). Dr.

Koella acknowledged that many of these limitations were based on Plaintiff's subjective

complaints but Dr. Koella stated that he also based these restrictions on objective findings (Tr.

772). The ALJ considered the opinion of Dr. Koella but gave it little weight, providing the

following rationale:

> Although the undersigned acknowledges that Dr. Koella, a primary care provider,
> has pronounced the claimant far more functionally limited than the undersigned
> finds him to be (Ex. 32F), as he would have the claimant lying down six hours out
> of every eight hours if this assessment were accurate, treatment notes do not
> support this degree of limitation. Moreover, the claimant admits to more ability
> and functional capacity than indicated by this physician. Thus, Dr. Koella's
> opinion is given little weight.

(Tr. p. 24)

Next, the ALJ considered the opinions of Dr. Lien and noted the differences of opinion

among Dr. Lien, Dr. Weiss and Dr. Babat:

> The record indicates that the claimant has received regular, continuous treatment
> for complaints of back pain since his alleged onset date. In October 2003, Dr.
> Lien noted that the claimant had had persistent lower back pain with a very mild
> lumbar radicular component and that a lumbar spine MRI revealed degenerative
> disc changes at the L5-S1 level with a relatively minor disc protrusion, but no
> gross disc herniation. After the claimant reported no improvement in his pain
> level after he had undergone conservative treatment which had included physical

therapy and epidural steroid injections, in January 2004, the claimant's primary care provider related that Dr. Lien had recommended surgery, but that the worker's compensation carrier had refused to approve the surgery after Dr. Wiess reviewed the claimant's case and felt that no surgery was indicated. In January 2004, the primary care provider stated that he suspected that the claimant had an addiction situation related to his long term use of narcotics. Another neurosurgeon, Dr. Babat, subsequently evaluated the claimant, and did not recommend surgical treatment. Dr. Babat noted that the claimant had three out of five positive Waddell's signs, perhaps four out of five if overreaction was considered. This physician suggested that the claimant's prior physical therapy treatment included a grossly inadequate trial of exercise, and recommended that the claimant could perform a sit-down job. (Exs. 1F,2F) Little weight is given to this opinion, as it appears that Dr. Babat was merely stating the least the claimant could do, in terms of his residual functional capacity, rather than the most he could do.

(Tr. p. 23)

I conclude under the circumstances, the ALJ did not ignore the opinions of any of these treating physicians but rather considered them in light of other evidence in the record and the degree to which they were supported by treatment notes. I conclude the ALJ's conclusions are supported by substantial evidence.

As stated above, the standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. After review of the

pleadings and the record, I conclude there is substantial evidence to support the conclusions of

the ALJ.

Conclusion

For the reasons stated herein, I RECOMMEND the Commissioner's decision be

AFFIRMED. I further RECOMMEND the defendant's Motion for Summary Judgment (Doc. 22)

be GRANTED, the plaintiff's Motion for Judgment Based upon the Administrative Record (Doc.

18) be DENIED, and this case be DISMISSED. [2]

Dated: January 15, 2010

*s/William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[2]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

27